## WESTERN PAC. RY. CO. v. SOUTHERN PAC. CO.*

(Circuit Court of Appeals, Ninth Circuit. February 4, 1907.)

No. 1,326.

**1. MUNICIPAL CORPORATIONS—BOUNDARY—SHIP CHANNEL.**

By Act Cal. May 4, 1852 (St. 1852, p. 180, c. 107), incorporating the town of Oakland, as construed by the Supreme Court of the state in City of [Oak]land v. Oakland Water Front Co., 50 Pac. 277, 118 Cal. 160, the bound-of said town on the water front, defined in the act as running from the point where the northeastern boundary intersects the southerly line of San Antonio creek or estuary; "thence down the southerly line of said creek or slough to its mouth in the bay; thence to ship channel; thence northerly and easterly by the line of ship channel to a point where the same bisects said northeastern boundary line," follows the line of low tide along the southerly side of the said estuary to its mouth in the bay; thence, crossing said estuary from headland to headland, follows the line of low tide in the Bay of San Francisco, as it then existed, to its intersec-tion with the northeastern boundary—"ship channel" being construed as meaning the line of low tide, and the grant to the town in said act of "the lands lying within the limits aforesaid between high tide and ship channel"—included only tide lands lying between the high and low tide lines on the northerly side of the estuary and the bay front.

**2. NAVIGABLE WATERS—LITTORAL RIGHTS—LAW GOVERNING.**

The rights of littoral owners in adjacent navigable waters depend on the local laws of the several states, subject to the paramount authority of the United States to protect navigation and to make improvements in aid of the same.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 239–244.]

**3. SAME—RIGHT TO WHARF OUT.**

At common law no right to wharf out to navigable waters attached to the ownership of shore lands, and such right, if it exists, must be based on some legislation of the state.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, § 257.]

**4. SAME—MUNICIPAL CORPORATIONS—CONVEYANCE OF LANDS ON WATER FRONT—CONSTRUCTION AND EFFECT.**

Act Cal. May 4, 1852 (St. 1852, p. 180, c. 107), entitled "An act to in-corporate the town of Oakland and to provide for the construction of wharves thereat," after creating the town, defining its boundaries, and providing for a board of trustees, vested in such trustees the power to make, regulate, and keep in repair all wharves, docks, etc., and further

---

* Rehearing denied March 4, 1907.

provided that, "with a view to facilitate the construction of wharves and other improvements. the lands lying within the limits aforesaid between high tide and ship channel are hereby granted and released to said town; provided that said lands shall be retained by said town as common property or disposed of for the purposes aforesaid." The town subsequently granted to an individual for a term of years the exclusive right and privilege of constructing wharves at any points within the corporate limits of the town and the right to collect wharfage, etc., and also sold and conveyed in fee to the same person the lands granted to it by the state, "with the right to erect wharves, piers, docks and buildings at any and all points thereon, not obstructing navigation." *Held*, that such conveyance could not be construed to carry with it the exclusive right in perpetuity of constructing wharves on the water front of the town, which was vested in the town by the act of incorporation, and in aid of which the grant of lands was made. but that such right was limited to the term expressly granted; nor did such conveyance vest the grantee with any right to wharf out beyond the boundaries of the lands granted.

**5.** ADVERSE POSSESSION—NATURE OF POSSESSION—INCLOSURE.

A tract of tide land, bounded on one side by the shore along which run railroad tracks owned by the owner of the tract and lying between a training wall built by the United States for the improvement of navigation. and a mole built out to deep water in a bay for the passage of railroad trains, with the fourth side open to the bay, is not "inclosed," within the meaning of Code Civ. Proc. Cal. § 323, so as to be deemed in the actual possession and occupancy of the owner under said section.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Adverse Possession, §§ 99–105.]

**6.** NAVIGABLE WATERS—LITTORAL RIGHTS—CALIFORNIA STATUTES.

Civ. Code Cal. § 1014, which provides that. "where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank," covers the whole subject of the right to alluvion in the state, and confines it to that which results from natural causes, and to that which forms on the bank of a river or stream, and gives no right to accretion by, alluvion to the owner of tide lands lying on the Bay of San Francisco.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 37, Navigable Waters, §§ 266–282.]

**7.** CONSTITUTIONAL LAW—VESTED RIGHTS.

One who acquires title to tide lands from the state obtains no vested right to possible future accretion thereto which cannot be cut off by subsequent legislation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 183.]

**8.** SAME—TIDE LANDS—CONSTRUCTION OF GRANT.

A grant by the state of California to the town of Oakland of tide lands, expressly limited to lands within the boundary of the town, which on the water front was fixed at the line of low tide, established a permanent boundary of such lands at that line, and such boundary cannot be extended beyond it into the waters of the bay outside of the corporate limits of the town by accretions.

Appeal from the Circuit Court of the United States for the Northern District of California.

For opinion below, see 144 Fed. 160.

The appellant, the Western Pacific Railway Company, a corporation created under the laws of California, engaged in the construction of a railway from Salt Lake City, in the state of Utah, to San Francisco, by way of Oakland, with a barge and ferry system from the city of Oakland across the bay to San Francisco, was, on and before January 10, 1906, in the possession of a certain

tract of made land on the north side of and adjacent to the north jetty or training wall, which is the northerly confine of the Oakland channel or San Antonio creek at its mouth in the bay of San Francisco at the water front of the city of Oakland. The tract so occupied extends along said north training wall both east and west of a certain imaginary line which was established by the government of the United States in 1893, known as the "United States Bulkhead Line." At the eastern extremity of the tract there is a bend in the

Gibbon's Pt.

SAN ANTONIO

north jetty. The northern boundary of the eastern portion of the tract runs parallel with the north jetty, and about 600 feet distant therefrom. Proceeding westward, the tract gradually widens to a point northwesterly of the western extremity of the north jetty, where it is 1,000 feet in width. The western end of the tract is inclosed by a bulkhead which extends north from the north jetty about 1,000 feet, and thence easterly for about 500 feet. The whole tract is about 1.4 miles in length. It all lies in San Francisco Bay below the ordinary low-tide line of the year 1852.

On January 10, 1906, the appellee herein, the Southern Pacific Company, filed in the court below its bill in equity against the appellant, alleging its ownership in fee of all that part of the above-described tract of land lying east of the United States bulkhead line, and claiming the exclusive right of access to navigable water over the residue of the tract. The prayer for relief was that the appellant, and others named in the bill as defendants, be enjoined and restrained from occupying any part of the said tract of land, and from maintaining any railroad tracks thereon or erecting any wharves, piers, or construction of any kind thereon, and from depositing mud or material thereon

by dredging or otherwise, or from interfering in any way with the possession and ownership of the property by the appellee, and that, pending a hearing on a ruling ot show cause why such injunction should not be issued, a restraining order be granted against the commission of any of said acts. On the filing of the bill, a restraining order was issued as prayed for, and was accompanied by an order upon the defendants in the bill to show cause upon a day named why an injunction pendente lite should not be granted. Shortly thereafter the appellant filed its cross-bill in the suit, alleging that it was in the actual and exclusive occupancy of the tract of land above described, asserting its right so to occupy the same by the consent of the city of Oakland, alleging that it was engaged in the construction of a railway from Salt Lake to San Francisco, and that its occupancy and use of the land were necessary in connection with its railway, especially for the purposes of its proposed barge and ferry system across the bay of San Francisco, and for trans-Pacific commerce. It alleged that the appellee had no interest in the premises, that the appellant had instituted certain condemnation proceedings for a right of way extending from certain lands which it owned in the city of Oakland, across and adjoining the lands claimed by the appellee and others, to the northeastern boundary of the tract in controversy. It was further alleged in the cross-bill that the appellee was intending and attempting by certain trestles and other work to enter upon the said premises, take possession thereof for its own purposes, and to eject the appellant therefrom. The appellant prayed that an injunction be issued against the appellee and those acting under it enjoining them from occupying any of said land, and from otherwise interfering therewith, pending the appellant's application for an injunction. Thereupon the court below issued a restraining order against the appellee in accordance with the prayer of the cross-bill, and made an order upon the appellee and the other defendants named in the cross-bill to show cause at a subsequent date why an injunction pendente lite should not be granted as prayed for in the cross-bill. The appellant also answered the original bill of complaint, denying the appellee's averments of title, possession, and right of access. The appellee likewise answered the cross-bill, denying the material averments thereof, but admitting its intention to eject the appellant from the land in controversy, if permitted so to do by the court. Thereafter both applications for injunctions pendente lite were brought on for hearing, and thereupon the court below granted the application of the appellee for an injunction pendente lite, and denied the application of the appellant therefor, and ordered the discharge of the restraining order theretofore granted to the appellant. The present appeal is taken from the order of the court below granting the injunction pendente lite in favor of the appellee, and against the appellant and its codefendants in the original bill. Upon granting permission to appeal, the court ordered, pending the appeal, a stay of its order for an injunction pendente lite, and suspended its order vacating the restraining order obtained by the appellant.

On May 4, 1852, the Legislature of the state of California incorporated the town of Oakland by an act, the title of which was "An act to incorporate the town of Oakland and to provide for the construction of wharves thereat." St. 1852, p. 180, c. 107. The first section of the act described the boundaries of the town as follows: "On the northeast by a straight line at right angles with Main street running from the bay of San Francisco on the north to the southerly line of the San Antonio creek or estuary, crossing Main street at a point three hundred and sixty rods northeasterly from Oakland House on the corner of Main and First streets as represented on 'Portoi's' map of 'Contra Costa' on file in the office of the Secretary of State, thence down the southerly line of said creek or slough to its mouth in the bay; thence to ship channel; thence northerly and easterly by the line of ship channel to a point where the same bisects said northeastern boundary line." Section 3 (page 181) provided that the town should have the power to construct and regulate wharves, docks, piers, and slips, and the power to authorize the construction of the same, and contains this provision: "With a view to facilitate the construction of wharves and other improvements, the lands lying within the limits aforesaid between high tide and ship channel are hereby granted and released to said town, provided that said land shall be retained by said town as common property or disposed of for the purposes aforesaid."

On May 18, 1852, the trustees of the town by an ordinance, granted to Horace W. Carpentier for a period of 37 years the exclusive right and privilege of constructing wharves, piers, and docks at any points within the corporate limits of the town of Oakland, with the right of collecting dockage and wharfage at such rates as he might deem reasonable, and further provided that: "The water front of said town, that is to say all the land lying within the limits of the town of Oakland between high tide and ship channel as described in said act, together with all the right, title and interest of the town of Oakland therein, is hereby sold, granted and released unto the said Horace W. Carpentier and to his assigns or legal representatives, with all the improvements, rights and interests thereunto belonging." These privileges were in the ordinance granted to Carpentier with the proviso that he or his representatives should, within six months, provide a wharf at the foot of Main street of certain prescribed dimensions, and another wharf at the foot of D street, and build for the town a public schoolhouse. In pursuance of that ordinance Amedee Marier, the president of the board of trustees of the town, on May 31, 1852, executed a conveyance to Carpentier of the lands so authorized to be conveyed to him: "that is to say, all the land lying within the now corporate limits of the town of Oakland and situated between high tide and ship channel as granted to said town and as described in the said aboveentitled act." On August 27, 1853, the board of trustees passed an ordinance ratifying the ordinance of May 18, 1852, and, in section 4, provided as follows: "The said ordinance entitled 'An ordinance for the disposal of the water front belonging to the town of Oakland and to provide for the construction of wharves' for the consideration therein set forth and expressed, and now in chief satisfactorily paid and performed, and in consideration of the premises is hereby ratified and confirmed and the said water front of the town as therein described is hereby granted, sold and conveyed unto the said Carpentier and his legal representatives in fee simple forever, with the right to make wharves, piers, docks and buildings at any and all points thereon, not obstructing navigation, and to freely use and occupy the lands herein conveyed."

The title which is asserted in the present suit by the Southern Pacific Company is derived from these ordinances, and from a corporation created in 1868, called the "Oakland Water Front Company." On March 25, 1854, the town of Oakland ceased to exist, and the city of Oakland became its successor as to all rights, and with the same boundaries. On August 24, 1857, the city of Oakland brought a suit in equity against Horace W. Carpentier and his wife to set aside the ordinances and deeds under which they claimed title to the franchises and real estate described in the act of May 4, 1852. The bill alleged that the ordinances were illegal and void, and that the deeds had been fraudulently obtained. The prayer for relief was that the ordinances and deeds be declared null and void. Such proceedings were had in that cause that, on a final appeal to the Supreme Court, it was held that the charges of fraud were not sustained; that, if the ordinances of the board of trustees of the town of Oakland were void, there was no occasion for the interference of equity; and that, if they were voidable only, relief could not be had until equity was done by the party invoking it, by placing or offering to place the defendant in the same position which he would have occupied but for relying on the acts of the agents of the town. The judgment of the court below was reversed. City of Oakland v. Carpentier, 21 Cal. 642.

On May 14, 1861, the Legislature of the state of California passed an act (St. 1861, p. 367, c. 360) amendatory and supplementary to the act of incorporation of the city of Oakland of March 25, 1854 (St. 1854, p. 183, c. 73), which provided that: "The common council of the city of Oakland is hereby authorized and empowered to ratify and confirm any ordinance or resolution of the board of trustees of the late town of Oakland." And further contains this language: "And the ordinances of the board of trustees of said town are hereby ratified and confirmed." On March 21, 1868 (St. 1867-68, p. 222, c. 230), the Legislature passed an act entitled "An act to enable the city of Oakland to settle its controversies." The entire act is in these words: "The council of the city of Oakland, with the concurrence of the mayor of said city, is hereby authorized and empowered to compromise, settle and adjust any and all claims, demands, controversies and causes of action in which the said city

is interested." This act was passed to adjust all differences, and had more especial reference to the construction of a railroad then coming into Oakland, known as the "Western Pacific Railroad," a different corporation from the appellant herein.

On March 28, 1868, the Oakland Water Front Company was created, of which Carpentier was a stockholder, and on March 31, 1868, Carpentier conveyed to the said Oakland Water Front Company "all of the water front of the city of Oakland, that is to say, all the lands and the lands covered with water lying within the limits of said city between high-tide mark and ship channel, being the water front lands within the boundaries described and granted in and defined by the act entitled 'An act to incorporate the town of Oakland,' etc., and all lands, rights, privileges and franchises of every kind and nature which have been heretofore acquired by the said party of the first part from the town of Oakland and the city of Oakland." On April 1, 1868, a contract was made and entered into between the Oakland Water Front Company, the Western Pacific Railroad Company, the city of Oakland, Horace W. Carpentier, John B. Felton, and Leland Stanford for conveyances to the railroad company and the city of Oakland, and for a distribution of the stock of the Oakland Water Front Company, and on the same day there was a further contract between the Western Pacific Railroad Company and Stanford and the Oakland Water Front Company, providing for the expenditure by the Railroad Company of certain moneys within a fixed time for terminal facilities in Oakland and the construction of certain buildings upon parcels of land which were to be conveyed under the compromise, and for other matters.

In recognition of these compromises, and in further execution thereof, on said 1st day of April, 1868, the said council of the city of Oakland adopted an ordinance "for the settlement of controversies and disputes concerning the water front of the city of Oakland and the franchises thereof and other matters relating thereto." The ordinance specifically mentions the ordinance of May 18, 1852, above referred to, whereby was granted to Carpentier a wharfing franchise for 37 years and land in fee. It refers to the ordinance of August 27, 1853, ratifying the prior ordinance, mentions various ordinances and the deed from Marier, the president of the board of trustees, and declares that the same "are hereby compromised, settled and adjusted and the said abovementioned ordinances and conveyance are made valid, binding and ratified and confirmed and all disputes, litigations, controversies, and claims in and to the franchises and property described in said ordinances and deed of conveyance and every part thereof are abandoned and released by the said city of Oakland to the said Carpentier and his assigns upon the following conditions, to wit." The conditions were that Carpentier and his assigns should convey by proper and sufficient deeds of conveyance all the property and franchises mentioned and described in said ordinances and deed of conveyance to the Oakland Water Front Company to be used and applied in accordance with the terms, conditions, stipulations, and agreements contained in certain contracts between that company and the said Western Pacific Railroad Company and other parties bearing even date therewith, with the exceptions in the said agreement specified.

On April 2, 1868, another ordinance was passed in recognition of compliance with the ordinance of the day before. After acknowledging that the terms and conditions of the ordinance of the day before had been fully satisfied and complied with by Carpentier and his assigns, the ordinance declares as follows: "All the ordinances and deed therein mentioned and described are hereby fully ratified and confirmed and all disputes, controversies, claims, demands and causes of action heretofore existing between the city of Oakland on the one part and Horace W. Carpentier and his assigns on the other part, relating to the force and validity of the said ordinances and deed are hereby abandoned and released by the said city of Oakland to the said Carpentier and his assigns, provided that nothing herein contained shall release the right of the city of Oakland to the reversion of the property, franchises and rights released as provided in the contract between the Western Pacific Railroad Company and the Oakland Water Front Company in case said city of Oakland shall become entitled to the same under said contract."

On August 23, 1893, the city of Oakland brought suit in the superior court

of Alameda county against the Oakland Water Front Company, to determine the adverse claim of that company to the land granted to the town of Oakland by the original act of incorporation of May 4, 1852. The Oakland Water Front Company asserted title to all lands within the boundaries of the city of Oakland lying below the lines of ordinary high tide of the bay of San Francisco and the estuary of San Antonio and ship channel, except a parcel relinquished to the city of Oakland by the compromise agreement, and certain other parcels which it had conveyed to others. The lands to which it claimed title in that suit included the premises which are now claimed by the appellee in the present suit as a successor in interest of the Oakland Water Front Company. On the trial of the case in the superior court a decree was rendered in favor of the city of Oakland and against the water front company. An appeal was taken to the Supreme Court, and that court, on September 13, 1897, handed down its decision reversing the judgment and remanding the cause for further proceedings. Oakland v. Oakland Water Front Co., 118 Cal. 160, 50 Pac. 277.

Joel F. Vaile and Franklin W. M. Cutcheon (Garrett W. McEnerney, Warren Olney, Chas. W. Slack, W. J. Bartnett, and Marcel E. Cerf, on the brief), for appellant.

A. A. Moore, Stanley Moore, John Garber, and P. F. Dunne (J. E. Foulds and Wm. F. Herrin, on the brief), for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

As the appellee's title is deraigned from the grant of lands to the town of Oakland by the act of May 4, 1852 (St. 1852, p. 180, c. 107), it becomes necessary to ascertain the extent and boundaries of that grant. It was a grant of lands, not coterminous with, but within the limits of, the town of Oakland. Both the limits of the town and the limits of the grant have been determined by the Supreme Court of California in a case in which it became necessary to construe the grant and the boundaries of both the town and the grant. City of Oakland v. Oakland Water Front Co., 118 Cal. 160, 50 Pac. 277. The construction placed by that court upon the language of the act of May 4, 1852, and its determination of the questions of local law involved in that suit, must, of course, be adopted by a federal court in dealing with questions arising under them. This rule is so well established that the citation of authority is unnecessary. Its binding force and its applicability to the present case are admitted by both parties to the controversy. The court in that case held that the southerly line of the San Antonio creek, intended by the act as the southern boundary of the town, was the line of low tide, and not the high-tide line. Said Chief Justice Beatty:

"I assume, then, as a proposition thoroughly established, that the eastern and southerly boundary of the town of Oakland extended along the line of low tide on the estuary crossing the inlet of the eastern basin at its mouth and continuing to the mouth of the estuary in the bay."

Having determined the southerly boundary of the town, the court approached the question of the westerly boundary, and entered into a discussion of the words "ship channel" as used in the description there-

of. The question was considered at length in the opinion of the chief justice. The scope of the discussion was premised with the following remarks:

"We must hold that 'ship channel' was a line capable of location on the ground, and must determine where it ran. That it was a line different from the line of high tide is rendered certain by the fact that the land granted is described as lying between the line of high tide and ship channel, but beyond this it cannot be said that anything is certain."

The chief justice considered the contention of both the parties to the cause then under consideration, in which contention both agreed, which was that the "ship channel" referred to in the description of the town limits was the line of three fathoms depth in the bay. This the opinion denominated an assumption that had no tangible basis, and said it was to be rejected, both because it was not a definite line, and because the call for the western boundary is "thence northerly and easterly by the line of ship channel to a point where the same bisects the said northeastern boundary line"; whereas, the three-fathom line does not run northerly and easterly, but runs throughout its whole extent in a uniformly northwesterly direction. After alluding to the fact that there never had been any law establishing a water front or bulkhead line in front of the city of Oakland, the court deduced this conclusion:

"Ship's channel comprises the waters left free to naviagtion; and, when we are required to locate its boundaries with precision, and no artificial boundary has been established by competent authority, we are driven to seek a definite natural boundary, if any such may be found, and here we do find such a boundary at the line of low tide. This is a definite line, and the only definite line beyond the line of high tide, and my conclusion is that the line of low tide as it existed on the 4th of May, 1852, was the western boundary of the town of Oakland intended by the original act of incorporation."

The result of the whole discussion was summed up in the opinion as follows:

"The boundary of the town of Oakland, as defined by the act of May 4, 1852, commencing at the intersection of the northeast line with the line of low tide on the eastern side of the northern branch of the estuary, follows the line of low tide on said branch to the mouth of the eastern basin, crosses said mouth, and continues along the line of low tide on the southern side of the estuary to its mouth in the bay; and thence follows the line of low tide northerly and easterly until it intersects the northeastern boundary line, as to the location of which there seems to be no dispute."

After defining the boundaries of the town, the opinion of the chief justice proceeds to define the limits of the grant of land to the town, which grant is expressed in the following words:

"With a view to facilitate the construction of wharves and other improvements, the lands lying within the limits aforesaid between high tide and ship channel are hereby granted and released to the said town, provided that said land shall be retained by said town as common property, or disposed of for the purposes aforesaid."

With reference to this grant, the opinion contains the following carefully considered language:

"The grant to Oakland was of the lands lying between high-water mark and ship channel within these boundaries, and therefore included nothing west of the line of low tide on the bay front, and nothing beyond the line of low tide on the north and west shore of the estuary. I say nothing was included beyond this line along the estuary, because the estuary was itself a part of the ship channel, and there was no part of the town between it and high tide on the south and east side. My reason for saying that the estuary was a part of ship channel is that it was in fact navigable, and that fact had been recognized and declared by an act passed only one day before the passage of the act incorporating Oakland. St. 1852, p. 182, c. 108. By this act the 'stream called San Antonio creek' was declared navigable from its mouth to the old embarcadero of San Antonio, and all obstructions to its navigation were forbidden. It is true this act does not seem to have included the northern branch of the estuary; but, in the view I take of the matter, legislative recognition of the fact of navigability was not necessary to constitute a ship channel. The fact was itself sufficient, and the coast survey map shows that the northern branch was navigable for every class of vessels that could go to San Antonio. Each branch had a depth of two feet at low tide—the same as the depth on the bar at the mouth of the estuary, which meant a depth at full high tide of from seven to eight feet every 24 hours, and this was sufficient to accommodate a very important traffic."

The attention of the court was directed to the doctrine of the Chicago Water Front Case (Illinois Central Railroad v. Illinois, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018), with reference to the power of the state to authorize the town to convey submerged lands to private owners, and the opinion proceeds as follows:

"If the conclusion above stated is sound, if the grant to Oakland comprised only the strip of land bounded by the lines of ordinary high and low tide and extending along the estuary and bay front of the town, the case is at once relieved of the question so much discussed in the argument as to the power of the Legislature to make such a grant to a private corporation or natural person, and the only question to be considered is whether the state has in this instance made the grant as claimed, for there is nothing in the doctrine established in the Chicago case to impeach the power of the Legislature of California or of any state to alienate tide lands—by which expression I am to be understood as referring to those lands only which are covered and uncovered by the daily flux and reflux of the tides."

And the chief justice quoted with approval the language of Judge Sanderson in Ward v. Mulford, 32 Cal. 372, in which it was said:

"The land which the state holds by virtue of her sovereignty, as is well understood, is such as is covered and uncovered by the flow and ebb of the neap or ordinary tides. Such land is held by the state in trust, and for the benefit of the people."

These expressions of the opinion of the chief justice, concurred in by two other members of the court, and supported by the associate justices especially concurring, render it clear that the majority of the court meant to say that the granted lands were tide lands or shore lands, and no other lands. This is borne out by other expressions of the chief justice in the opinion. He refers to the title under the grant as "private ownership of the shore," and to the grantee as a "grantee of shore lands," and again, arguendo, he refused to impute to the Legislature an intention to vest the town council with authority to cut the town off from access to the water front "by a transfer of the whole strip of shore lands."

The opinion of the Chief Justice was concurred in without modification or reserve by two others of the members of the court. Mr. Justice McFarland filed a brief concurring opinion, in which he said:

"I concur in the judgment of reversal, and in the conclusion reached in the opinion of the chief justice, that the grant involved in this case and the land claimed by the water front company is limited by the line of low tide on the westerly side and on the estuary, and with respect to all other boundaries, by the lines designated in said opinion. In that view the case at bar is not within the Chicago case, and, with respect to the general power of the state to dispose of her lands lying under navigable waters within her borders, I express no opinion."

Justice Garoutte also concurred, and said:

"The grant in this case should be confined within the smallest limits possible. The state should have the benefit of all doubtful constructions in matter of description, and for this reason the westerly line of the grant should be established at the point of low tide. In this respect I agree with the conclusion of the chief justice. * * * The views here expressed refer to tide lands not covered by navigable waters. As to lands under navigable waters, I leave the question open."

Mr. Justice Harrison, with whom concurred Mr. Justice Henshaw, dissented, on the ground that no valid grant of the lands had ever been made. We have, then, the concurrence of five of the members of the court in the decision as to the limits and definition of the boundaries of the town of Oakland and of the grant of lands to the town.

We have here, then, the decision of the Supreme Court of California, deliberately expressed in carefully chosen phrase, that "ship channel," as the term is used in defining the boundaries of the town, is ordinary low-water mark; that the boundary follows the line of low tide along the south shore of San Antonio creek, by the low tide of the bay on the headland south of the mouth of the creek, thence across the navigable water of the estuary to the low-tide headland on the north thereof, and thence northeasterly by the low-tide line of the bay; and that the grant of lands to the town of Oakland is only of the land between high-water mark and ship channel within those boundaries, and includes nothing west of the line of ordinary low tide on the bay front, and nothing beyond the line of ordinary low tide on the north shore of the estuary. These lines are definite and fixed and capable of ascertainment. The lands in controversy in the present suit lie entirely without the limits of the grant to the town as it is thus judicially determined by the court.

But the court below found, in the decision of the Supreme Court of California, a meaning widely variant from this, and reached the conclusion that the line of low tide, which the opinion in that case declared was the line of ship channel, did not mean the line of low tide on the bay front, but another line lying waterward of low tide, the line of the limit of convenient navigation from the bay, a line along the outer edge of a certain bar lying about a mile off the mouth of San Antonio creek, a line which is now approximately marked by the United States bulkhead line. This conclusion was reached upon a consideration of certain expressions which are used in the opinion of Chief Justice Beatty,

151 F.—25

one of which is the sentence found on page 180 of 118 Cal., page 284 of 50 Pac.: "Ship's channel comprises the waters left free to navigation." In this the court below found support for the theory that Chief Justice Beatty meant by the line of low tide the line at which convenient navigation was interrupted at any stage of the tide. The sentence was used in connection with a discussion of the San Francisco beach and water lot act, to which the Chief Justice adverted in search of an analogous use of the term "ship channel." He found that in that act the expression "line of ship's channel" had been used. "Now, here," he said, "we have an indication of the meaning of the term. The water front established by law and ship's channel are coterminous. The line to which the city may extend its streets and within which it may sell lots and authorize the purchasers to fill them up and occupy them is water front; immediately beyond is ship's channel." And the chief justice reached the conclusion that the term "ship's channel," so used in the act relating to San Francisco, was intended to include all the navigable waters of the bay outside of the bulkhead line as then established by law. But, proceeding with the discussion, he said:

"But this does not fully solve the question as to Oakland, because there was not in 1852, and never has been, any law establishing a water front or bulkhead line of that city. We are, however, helped this far: Ship's channel comprises the waters left free to navigation, and, when we are required to locate its boundaries with precision, and no artificial boundary has been established by competent authority, we are driven to seek a definite natural boundary, if any such may be found, and here we do find such a boundary at the line of low tide. This is a definite line, and the only definite line beyond the line of high tide, and my conclusion is that the line of low tide as it existed on the 4th of May, 1852, was the western boundary of the town of Oakland intended by the original act of incorporation."

Nothing could be clearer, we think, than that the opinion directly and entirely rejects the theory of navigability as the test of the position of the line of low tide. In the case of the San Francisco beach and water lot act there was a definitely marked line, a bulkhead line between land and water. That was found to be the line of "ship's channel," within the meaning of that act. But, along the water front of the town of Oakland at the time of its incorporation, there was no such line. The only fixed and definite line was the line of low tide. This was the line which the Supreme Court of California adopted, and, when the Chief Justice said, "ship's channel comprises the waters left free to navigation," he did not mean waters free from obstruction to navigation, but all the waters of the bay proceeding landward to the line of demarcation from the land. We find no warrant for holding that any other line was intended. There was no other line.

But the decision of the court below seems to have been principally influenced by the sentence contained in brackets in the following portion of Chief Justice Beatty's opinion:

"The call for the western boundary is 'thence northerly and easterly by the line of ship channel to a point where the same bisects the said northeastern boundary line.' But the three-fathom line does not run northerly and easterly. It runs throughout its whole extent in a uniform northwesterly direction,

whereas, the line of low tide from the mouth of the estuary at low tide [this point is marked by the intersection of the United States government bulkhead line with the jetty walls] exactly fulfills this call in the description; that is, its course is northerly and easterly—a circumstance sufficient in itself to counterbalance the force of the words 'thence to ship channel,' in the previous call."

The court below, after quoting this language, said:

"We have here a positive identification of the point of departure for the last call of the description, namely, commencing at the point marked by the intersection of the United States government bulkhead line with the jetty walls."

We are unable to agree with the court below that Judge Beatty intended to find in the intersection of the government bulkhead line with the jetty walls a point of departure for the last call of the description, for there were two of those walls separated by an interval of 800 feet. We understand the opinion of Judge Beatty to mean that the course of the western boundary line of the town running north-easterly from low tide at the southwest corner of the town across the mouth of the estuary is approximately marked by the intersection of the government bulkhead line with the south jetty wall. We know that he had before him the United States coast survey map of 1859, and it can be seen that on that map, on the scale upon which it is drawn, a line crossing the estuary from the low tide line of the bay on the south side of the estuary, to the corresponding low-tide headland on the opposite side thereof, will pass apparently but a short distance aside of the bulkhead line where that line touches the shoal or bar off the mouth of the estuary. It should be borne in mind that the bracketed sentence so relied upon appears in a portion of the opinion which is addressed to the contention presented by counsel upon both sides of that case that by ship channel was meant the three fathom line in the bay. In answering that contention the chief justice directed attention to the fact that the three-fathom line would never run northwardly and eastwardly according to the call of the last course, but would always and uniformly run in a northwesterly direction. He was not, in that portion of his opinion, attempting to locate the actual position of the line of low tide. It is true, as he said, that from the mouth of the estuary the boundary line runs northerly and easterly. That line is, by operation of law, the low-tide line across the mouth of the estuary. It is not a low-tide line in fact. We cannot find, in this casual, and perhaps inadvertent, expression of the opinion, an intention to modify the whole purport of the decision, elsewhere so clearly and precisely expressed in words carefully chosen, and to declare that it does not mean what its clear import intends, but something entirely at variance therewith. Throughout the whole discussion the chief justice had been in search of a "definite natural boundary," to meet the call for the line of ship channel. He found it in the line of low tide, and said: "This is a definite line, and the only definite line beyond the line of high tide." The line north of the estuary, which was adopted by the court below, is not only not a definite line, but it is not a natural line. Between it and high tide lies the definite natural line of low tide.

The appellee, while admitting that the western boundary of the town

of Oakland is as we have found it, contends that that western boundary is throughout its whole length the line of low tide, and that this is likewise the western boundary of the grant, within the meaning of the decision in the Oakland Water Front Case, locating the granted lands between high and low tide. The appellee's contention is best exhibited by its map, which is here inserted:

On that map the line of actual low tide north of the estuary, as it was in 1852, is marked "false line of 1852." It is admitted that it is the true line of low tide of 1852, as shown by the government maps; but it is said that the true line of low tide as the boundary of the granted lands, as determined by the decision before referred to, is the line running from "D" to "E," and that this contention is sustained, not only by the opinion of Chief Justice Beatty, but by the decision of other courts, citing Knight v. U. S. Land Association, 142 U. S. 161, 12 Sup. Ct. 258, 35 L. Ed. 974, and San Francisco v. Le Roy, 138 U. S. 656, 11 Sup. Ct. 364, 34 L. Ed. 1096. This is claimed by virtue of a rule of surveying, which is thus stated by Justice Field in his concurring opinion, in Knight v. U. S. Land Association:

"Where a water of larger dimension is intersected by a water of a smaller dimension, the line of measurement of the first crosses the latter at the points of junction from headland to headland. The existence of tide lands in the intersecting water in no respect affects the result."

This is the established rule of surveying applicable to affluents or other waters which interrupt a tide line adopted as a boundary. The rule is to draw the line between the nearest points of land on each side of the interruption in continuation of the general outline. But the line crossing such intervening water, while a true boundary line, is not in any sense in itself a tide line, but a projection thereof.

Nor do we find anything in the opinion in the Oakland Water Front Case to sustain the appellee's contention. It is said, in its brief, that:

"Judge Beatty makes the eastern and south low-tide line of the estuary a continuous and unbroken line, despite the sinuosities of the Brooklyn Basin and overleaping them from headland to headland."

It is true that Judge Beatty, in locating the south line of the town, held that the line was to be carried across from headland to headland at the mouth of the Brooklyn Basin, but that is not to say that the tide line itself crossed the water of that basin. . What he said was that:

"The boundary of the town of Oakland * * * follows the line of low tide on said branch to the mouth of the eastern basin, crosses said mouth, and continues along the line of low tide."

He thus expressly recognized an interruption in the tide line. It is obvious that the line of measurement and location of a tide line, when adopted as a boundary may, at points of interruption, be very different from the line of actual tide. It was not a theoretical but the actual low-tide line which was adopted by the court in the Oakland Water Front Case as the boundary of the granted lands. This is made too clear to admit of question. When the chief justice had traced the southern boundary to the headland, which is marked "D" on the appellee's map, he carried it across the intervening navigable water to the opposite headland, marked "E." This line he found to substantially mark the mouth of the estuary, and it is very clear from his opinion that he considered that the estuary itself continued westward to this point. In speaking of the navigability of the estuary, he said:

"Each branch had a depth of two feet at low tide, the same as the depth on the bar at the mouth of the estuary, which meant a depth at full high tide of from seven to eight feet every 24 hours, and this was sufficient to accommodate a very important traffic."

Judge Beatty considered that the estuary extended westward at least as far as the western boundary of the town, and, in defining the grant to Oakland as lands including nothing west of the line of low tide on the bay front, and nothing beyond the line of low tide on the north and west shore of the estuary, he said:

"I say nothing was included beyond this line along the estuary, because the estuary was itself a part of the ship channel, and there was no part of the town between it and high tide on the south and east side."

It is contended that, in any view of the proper position of the line of ship channel, the appellee has the right to wharf out to deep water over the tide lands which it owns, and that that right is so exclusive in its nature as to justify the court below in enjoining the appellant from occupying the strip of land immediately adjoining the north jetty and between the United States bulkhead line and the pierhead line. The rights of littoral owners in adjacent navigable waters depend on the local laws of the several states, subject to the paramount authority of the United States to protect navigation and to make improvements in aid of the same. It may be said, in general, that such owners have the right of access to the channel or navigable part of adjacent waters, unless prevented by improvements made under the constitutional authority vested in Congress. But the question of the right of access, strictly so-called, is not necessarily here involved. The right which the appellee claims, and which was accorded it by the court below, is the right to wharf out to navigable water. At common law no such right attached to the owner of shore lands. Gould on Waters, § 167; Yates v. Milwaukee, 10 Wall. 497, 19 L. Ed. 984; Weber v. Harbor Commissioners, 18 Wall. 57, 21 L. Ed. 798; Hedges v. West Shore R. R. Co., 150 N. Y. 150, 44 N. E. 691, 55 Am. St. Rep. 660. Said the Supreme Court of California, in Dana v. Jackson St. Wharf Co., 31 Cal. 118, 89 Am. Dec. 164:

"A riparian proprietor on navigable water has no right at common law to wharf out against his own land. By the common law any erection below high-water mark, without license, is regarded as an encroachment and intrusion on the king's soil, which the king may demolish, seize, or arrent at his pleasure."

The appellee has not acquired the right to wharf out, under the general statute of California, providing for the exercise of that right, and its right so to do must depend upon the construction of its title through Carpentier, under the grant made to Carpentier from the town of Oakland, and the subsequent act of the Legislature affirming the same.

What was the act of May 4, 1852? Its title is of significance in construing its intent and purpose. It was "An act to incorporate the town of Oakland and to provide for the construction of wharves thereat." The grant of lands which it contains, therefore, must have been made in aid of the general purpose mentioned in the title, and it is so expressly declared. The first section of the act creates the town and defines its boundaries. The second section (page 181) provides for a board of trustees. The third section gives to the board power to make, regulate, and keep in repair all wharves, docks, piers, and slips, and also authorizes the construction of the same, and proceeds with these words:

"And with a view to facilitate the construction of wharves and other improvements, the lands lying within the limits aforesaid, between high tide and ship channel are hereby granted and released to said town; Provided that said lands shall be retained by said town as common property or disposed of for the purposes aforesaid."

There is undoubtedly implied in this grant, when read with the title, "to provide for the construction of wharves thereat," the right to project wharves into the bay, whether within or without the corporate limits of the town, for the purpose of reaching navigable water. Said the court, in Langdon v. Mayor, 93 N. Y. 129–151:

"Water of sufficient depth to float vessels is an essential part of every wharf, a necessary incident thereto or appurtenant thereto, without which there can be no wharf and no wharfage. No wharf can be defined or conceived except in connection with adjacent navigable waters."

It was in aid of this grant of the right to construct wharves that the land between high tide and ship channel was granted and released to the town, since access to deep water could only be had by passing over the intermediate tide lands. The express grant of authority to the town to construct wharves is the full expression of the legislative will as to that authority, and it implies the exclusion of any such authority as incident to the grant of the lands which the act expressly said was made to facilitate the exercise of the power to wharf out. It is not to be presumed that the Legislature intended, by making the subsidiary grant of lands, to grant therewith by inference or by implication a right which had already been granted and defined in express terms.

The town, having received this right to construct wharves, and the grant in aid thereof, adopted an ordinance for the disposal of the water front and for the construction of wharves. This ordinance gave to Carpentier for the period of 37 years "the exclusive right and privilege of constructing wharves, piers and docks at any points within the corporate limits of the town of Oakland with the right of collecting wharfage," etc. Section 2 of the ordinance provides:

"With a view the more speedily to carry out the intentions and purposes of the act of the Legislature passed May 4, 1852, * * * the water front of said town, that is to say, all the land lying within the limits of the town of Oakland between the high tide and ship channel as described in said act, together with all the right, title and interest of the town of Oakland therein is hereby sold, granted and released unto the said Horace W. Carpentier and to his assigns," etc.

In this ordinance is granted to Carpentier the exclusive right to construct wharves at any points within the corporate limits of the town, and in addition thereto, in a separate section of the ordinance, there is a grant of lands between high-water mark and ship channel within the town. The rights so granted are so plain and well defined as to require no construction, and there would be but little room for discussion as to Carpentier's rights, were it not for the confirmatory ordinance of August 27, 1853, on which the appellee relies for its contention that the town granted to Carpentier the exclusive right in perpetuity of constructing wharves on the water front of the town. That ordinance was passed upon the substantial performance on the part of Carpentier

of the obligations which he had assumed as conditions of the grant. Section 4 of that ordinance is as follows:

"The said ordinance entitled 'An ordinance for the disposal of the water front belonging to the town of Oakland and to provide for the construction of wharves' for the consideration therein set forth and expressed and now in chief satisfactorily paid and performed and in consideration of the premises is hereby ratified and confirmed, and said water front of the town as therein described is hereby granted, sold and conveyed unto the said Carpentier and his legal representatives in fee simple forever, with the right to erect wharves, piers, docks and buildings at any and all points thereon, not obstructing navigation, and to freely use and occupy the lands herein conveyed."

As we construe this ordinance, its effect is to ratify the previous ordinance, and nothing more. It ratifies the grant of an exclusive wharfing privilege for the term of 37 years. It ratifies the conveyance of land which had already been granted in fee simple. It adds, however, to the grant of the lands, "the right to erect wharves, piers, docks and buildings at any points thereon not obstructing navigation." What was the purpose, and what is the effect, of these words? The land having been granted in fee simple, the grant of a right to erect wharves and buildings thereon could add nothing to the rights which went with the fee-simple title. It is not to be presumed that the ratifying ordinance was intended to convey any further grant than the prior ordinance. There was no consideration for any such further grant. It must be clear to any one who reads the record of these ordinances, and the litigation which has followed, that the trustees of the town of Oakland and Carpentier at all times supposed that the waterward limit of the grant of lands was a practicable ship channel, and that it included land lying under the waters of the bay. The town had granted to Carpentier the exclusive right to erect wharves, piers, and docks at any points within the corporate limits of the town, and in this ordinance of 1853 the trustees declared their intention to give him the right to erect wharves and buildings on the granted lands, with the restriction that he should not thereby obstruct navigation. It would seem that the expression of the right to erect such wharves and buildings on the granted lands was set forth, not for the purpose of enlarging the prior grant, but for the purpose of so restricting the right to construct buildings and wharves thereon that navigation should not be obstructed. When the Supreme Court of California, by the decision in the Oakland Water Front Case, curtailed the grant of lands to the line of low tide, it necessarily therewith curtailed the expressed right of erecting wharves and buildings which were by the ordinance of 1853 permitted to be placed only on the granted lands. To say that the ordinance of 1853 changed the grant of an exclusive privilege, which was limited to 37 years, into an exclusive privilege in perpetuity, is to say that the latter ordinance ratified only a portion of the former, and that it vastly enlarged the prior grant by nullifying the limitation as to the duration of the privilege. There is a principle of construction which is applicable here. Said the court, in the Chicago Water Front Case, 146 U. S. 468, 13 Sup. Ct. 124, 36 L. Ed. 1018:

"If there is any ambiguity or uncertainty in the act, that interpretation must be put upon it which is most favorable to the state."

SAN FRANCISCO BAY

OAKLAND
ALAMEDA CO., CALIF.

MAR.15-06.

Long Wharf

Oakland Pier

OAKLAND MOLE & LONG WHARF TRACT
319± ACRES

SOUTHERN PACIFIC TERMINUS OAKLAND MOLE and LONG WHARF and PERALTA STREET SLIP.
SOUTHERN PACIFIC UPLAND TRACT
SOUTHERN PACIFIC TRACTS TIDE LANDS Nº 1 AND 2
STATE LANDS BULKHEAD A AND B
WESTERN PACIFIC TERMINAL PROPERTY AND RIGHT OF WAY ASKED FOR
TRACT OF LAND IN CONTROVERSE

Alameda Mole

BULKHEADS "A" & "B"

SAN ANTONIO ESTUARY

S.P.Co. Nº 2

S.P.Co. Nº 1

U.S. Bulkhead Line & Line of Low Water
Low Water Line Oct. 23rd 1905.

Southern and Westerly boundary line of Oakland
Water Front as located by the Supreme Court of the
State 118 Cal. 160, 169, 177, 180, 181.

WESTERN PACIFIC TERMINAL PROPERTY

PERALTA SLIP

C.P.R.R. TRACT

Sand Point

South Harbor Line

North Harbor Line

In the Oakland Water Front Case, Chief Justice Beatty said:

"Certain it is at all times that no such downright absurdity can be imputed to the Legislature as an intention to vest the council with authority to cut the town off from access to the water front by a transfer of the whole strip of shore land at the same time that they were charged with the duty of erecting wharves, and when the construction of wharves was not only one of the declared purposes of the act, but the express motive of the grant."

In that case Chief Justice Beatty, discussing the question of the validity of these ordinances of the town of Oakland, said:

"The town council was invested with power, among other things, to lay out streets, and the plain intent of the law was that the streets of the town should be protracted to the water front, the intervening spaces divided into blocks and lots, and sold in subdivisions in such a manner as to preserve to the public ample means of access to the navigable waters of the bay and estuary and to the municipal authorities ample space for the erection of wharves, piers, and docks. * * * My conclusion upon this point is: The ordinances and deed of 1852-53, by which it was attempted to transfer the entire water front to Carpentier, were wholly void."

This conclusion was concurred in by the majority of the court. The majority of the court held also that the legislative action of March 31, 1868, and the compromise ordinance of April 1, 1868, validated those void ordinances and deed. Turning to the compromise ordinance, we find that it ordains that the controversies which had theretofore existed between the city of Oakland and Carpentier and his assigns, relating to the validity and effect of the ordinance of 1852 and the conveyance executed by Marier, as the president of the board of trustees, also the ordinance of August 27, 1853, wherein and whereby the said first-mentioned ordinance was in all things ratified and confirmed and the said water front again granted, sold, and conveyed to the said Carpentier in fee simple forever, "are hereby confirmed, settled and adjusted, and the said above-mentioned ordinances and conveyances are made valid, binding, ratified and confirmed." This defines the scope of the ordinance of 1853, and declares that thereby the said water front was again granted, sold, and conveyed, thus recognizing the intention of that ordinance to be merely to grant again and confirm rights already granted. If we are right in this construction of the ordinances, as vivified by the compromise ordinance of 1868, the wharfing privilege granted to Carpentier in 1852 is not now vested in the appellee, but it has long since expired, and has reverted to the city of Oakland, as the successor of the original town of Oakland.

The appellee contends that, at and before the commencement of the suit, it was in the actual, open, notorious, adverse, and exclusive possession of the strip of land which is here in controversy. It claims that it had such possession under two conveyances; the first a deed of date October 31, 1892, which conveys the tract designated as "S. P. C. Co. No. 1" on the map which is found in the opinion of the court below, and which is here adopted.

The description in that deed is of a tract bounded on the northwest by a diagonal line running from the corner marked "3," south 60° 08' west to the middle of ship channel; thence easterly along the middle line of ship channel to its intersection with the westernmost boundary line (produced southerly) of the 59-acre tract conveyed to

the Central Pacific Railroad Company by the Oakland Water Front Company by deed dated May 3, 1878. This description locates the south line of the tract on a line running east and west midway between the north training wall and the south training wall. The second deed is of date January 8, 1903. It conveys all of the real property owned by the Oakland Water Front Company within the boundaries of a tract bounded on the north by the 319-acre tract, which had theretofore been conveyed to the Central Pacific Railroad Company, marked on the map "Oakland Mole and Long Wharf Tract," on the east and south by the Peralta grant land and by the diagonal line mentioned as the northwest boundary of the tract marked "S. P. C. Co. No. 1," on the south by the north training wall of the San Antonio estuary, and on the west. by ship's channel of the bay of San Francisco.

It is evident that this latter deed could give no color of title to any land westward or southward of the line of the land actually owned by the Oakland Water Front Company. While the appellee does not contend that it was in the actual physical occupancy of these lands, it urges that the lands so described in these conveyances were inclosed, and that thereby the appellee had possession of the tract in dispute at the time when the appellant committed the acts which are complained of in the bill. The contention is that the land was inclosed on the south by the north training wall, on the north by the Oakland Mole, on the east by the upland and the Peralta Street Slip, both of which were held and occupied by the appellee, and on the west by the waters of the bay. Was this an inclosure, within the meaning of section 323 of the Code of Civil Procedure of California, which declares that land shall be deemed to be possessed and occupied "where it has been protected by a substantial inclosure"? It is not disputed that there was no fence or wall or any mark of an inclosure along the diagonal line between these two tracts, but deeming, as we may, the two tracts one when dealing with the question of their inclosure, was the whole tract within or protected by a substantial inclosure?

We find no ground for holding that the Oakland Mole is an inclosing wall or structure. It would convey no such idea to an observer. It is a structure extending a long distance into the bay made solely for the transit of trains to and from ferry boats at deep water. The north training wall of the San Antonio estuary was made, not by the appellee or its predecessors in interest, but by the United States government for the purpose of improving navigation in the estuary. It was not intended as an inclosing wall, and there is nothing to show that it was ever used or claimed as such. Here, then, was a tract 2,000 feet in width, lying between these two structures, which projected out into the bay. There was nothing visible to indicate an inclosure on either the east or the west end, save the open waters of the bay, on the west, and the appellee's railroad tracks, on the east. It is not to be denied that, if there had been a fence or inclosing wall on three sides of the tract, the water of the bay would serve therewith to constitute an inclosure. The possession of the appellee of the upland for its tracks and trains, and its possession of the Peralta Street Slip, suggested no occupation of the government's north training wall or adoption of the same as an inclosing structure.

The appellee relies on Conroy v. Duane, 45 Cal. 597. In that case the plaintiff's grantor had built a fence entirely around the premises claimed, the east side of which was located in the mud flats of the bay. The fence on that side was destroyed by a gale. The plaintiff had prepared to rebuild it, and for that purpose had deposited there a load of lumber. Speaking of the original fence, the court said:

"It appears to have been a substantial fence, sufficient to turn cattle, and inclosed the whole block. * * * Whether his actual possession continued after the easterly line of fence was destroyed may possibly depend upon the fact whether there was a natural barrier on that side which supplied the place of a fence, and rendered one unnecessary."

The court then referred to the fact that the land was a salt marsh covered at high tide with water to a depth of two feet, inclosed on three sides by a substantial fence, and on the fourth side by the bay or mud flat, over which cattle could not cross, and reached the conclusion that there could be no doubt that it was a substantial inclosure sufficient to establish actual possession of the premises.

The distinction between that case and the present case scarcely needs to be pointed out. Here was a large tract fronting on the bay, north of which was a structure not a fence, not made or used for an inclosure, on the south a similar structure made by the government for the improvement or navigation, on the east a line of railroad tracks showing actual occupation of the ground on which they were placed, but suggesting no occupation to the west thereof, and on the west the open waters of the bay. We hold that this was not an inclosure, within either the meaning of the Code of Civil Procedure of California or the general law, which would be applicable in the absence of a statute. There being no inclosure and no physical occupation of the premises, it must be held that the appellee was not in the possession.

But it is argued that the occupancy of the appellant is a scrambling possession, sustained by force and arms, and that it is not such a possession as to give it any rights. The appellee, in its bill, alleges that the appellant and the American Dredging Company have constructed a bulkhead, commencing at or near the west end of the north training wall, and running thence perpendicularly thereto northerly about 1,000 feet, and thence at right angles easterly toward the shore, parallel to the said training wall about 3,000 feet, and that, at the time of the filing of the bill, said northerly construction parallel to the said north training wall was completed as a bulkhead for about 500 feet with piling driven for 2,500 feet or more additional still to the easterly, and crossing the United States bulkhead line, and that this was done to gain an actual possession and occupation upon the permanently submerged lands in the bay within said strip of 1,000 feet, the same to be used for general railway purposes; that, through the inducement of the appellant, there has been dredged and thrown upon the submerged lands within the inclosure so formed large quantities of earth and sand; that the appellant and said dredging company have been filling and are now filling the same with sand and débris and laying railway tracks thereon, and are now constructing, partly upon the appellee's lands and partly upon the lands to the west thereof, a railroad track; and that the appellant is maintaining upon the land armed

bodies of men in large numbers who patrol said track. It is not alleged that the original entry by the appellant was with force or violence, or that the appellee, or any one holding under it, was ousted from the actual possession of the premises in controversy. Under this state of facts, it becomes unnecessary to enter into a discussion of the nature or extent of the appellant's rights. The question here is one of the nature of the appellee's rights, since it must prevail, if at all, on the strength of its own title.

Section 1006 of the Civil Code of California provides:

"Occupancy for any period confers title sufficient against all except the state and those who have title by prescription, accession, transfer, will or succession."

The charter of the city of Oakland, adopted in 1889, imposes upon the city the duty to "grant to any railroad company or corporation applying therefor a franchise to lay and maintain tracks along any line selected by the applicant," and it contains a similar provision in regard to the duty of granting privileges under certain restrictions, for the construction of wharves, docks, slips, landing places, ferries, warehouses, and other property devoted to public use.

The appellee contends that by accretion the line of low tide, as it existed in 1852, has since that date been extended to the south and west so far as to include, at the present time, all of the land in controversy lying east of the United States bulkhead line, and that the land so added by accretion has become the property of the appellee, even if the limit of its land was originally the low-tide line. The evidence shows that the low-tide line of 1852 remained substantially unchanged until the year 1882, and that about that time changes in its position took place as the result of the deposit of material taken out of the channel on the south side of the north jetty constructed by the authority of the United States, and deposited on the north side thereof in the vicinity of the shoal which lay off the mouth of San Antonio estuary, also from material dredged by the Central Pacific Company, the predecessors of the appellee, in making a ship channel on the south side of the Oakland Mole, a large portion of which was carried in scows and deposited in the vicinity of the United States bulkhead line south and west of Gibbon's Point. In addition to this a large amount of dredging was done by private parties and under municipal authority in and about Oakland Harbor, the product of which was deposited in the space between the Oakland Mole and the north jetty. From these combined causes, and perhaps others, the waters of the bay along the shore have been filled, until, at the time of the commencement of the present suit, the line of low tide was as far west as the United States bulkhead line.

"Accretion," generally speaking, is the product of gradual and imperceptible deposit on the shore, of earth, sand, or sediment, brought by contiguous waters, whether resulting from natural or artificial causes, or both combined. County of St. Clair v. Lovingston, 23 Wall. 46, 23 L. Ed. 59. In that case it was said:

"In the light of the authorities, 'alluvion' may be defined as an addition to riparian land gradually and imperceptibly made by the water to which the land is contiguous."

The right of the riparian proprietor, which in that case was upheld, was later defined, in Shively v. Bowlby, 152 U. S. 36, 14 Sup. Ct. 548, 38 L. Ed. 331, to be "the right to alluvion or increase of the upland by gradual and imperceptible degrees."

Was the appellee a riparian proprietor, and did it become the owner by accretion of the land lying between the limit of its original grant and the present line of low tide?

The appellant contends, on the authority of Dana v. Jackson Street Wharf Co., 31 Cal. 118, 89 Am. Dec. 164, and Weber v. Harbor Commissioners, 18 Wall. 57, 21 L. Ed. 798, that the holder of a water lot on the bay front of San Francisco Bay is not a riparian proprietor. It may be doubted whether the doctrine of those decisions is applicable to the present case, for the land of the appellee herein included nothing under the waters of the bay. The appellant contends, also, that from the evidence in the record it appears that the added land was made by dredging, and that the deposit of material is therefore not in any proper sense accretion, for the reason that, while the ebb and flow of the tide may have caused its even distribution, the material so deposited was not carried upon the premises by the water, citing the rule that the doctrine of accretion does not apply to land reclaimed by human agencies. In re Driveway in City of New York, 93 N. Y. Supp. 1107; Sage v. Mayor, 154 N. Y. 61–83, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592. The appellee, on the other hand, claims to find in the evidence sufficient proof to sustain the theory that the north jetty wall, and the material deposited thereat, formed with the Oakland Mole and the shore an impounding basin, into which material brought into the bay by the Sacramento river was carried and there dejected, thereby producing the greater portion of the deposit. The court below, having placed the boundary line of the granted land as far westward as the United States bulkhead line, found it unnecessary to discuss the question of accretion, and made no finding thereon.

We need not enter into a discussion of the conflicting testimony on this point, for in our opinion the material so deposited in front of the appellee's land, from whatever source it came, is not alluvion, within the law of the state of California. The Civil Code of California, adopted in 1873, under the caption of "Accession to Real Property," defines, in section 1014, the right to alluvion, as follows:

"Where from natural causes land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank."

Section 4 of the Civil Code provides: "The Code establishes the law of this state respecting the subjects to which it relates." And it further provides that the rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to the Code. Section 1014 covers, therefore, the whole subject of the right to alluvion, and confines it to that which results from natural causes, and to that which is formed on the banks of rivers or streams.

In Louisiana a similar statute, giving the right to accretions only to riparian owners of land "situate on the shore of a river or other

stream," was held not to recognize any property right in such accretion when formed on lakes, bays, arms of the sea, or other large bodies of water, and it was held that the modes of acquisition of property were limited to those so expressly prescribed, and could not be extended by implication. Zeller v. Yacht Club, 34 La. Ann. 837. The appellee argues that there is a material difference between the language of the Louisiana statute and that of California, that the former is more restrictive, and that the use of the word "other" therein, in connection with the word "river," suggests that the whole statute must refer to running water. We find no ground for this distinction. In the California statute it is evident that the word "stream" is used in the same sense as river, and as a more comprehensive term. The primary meaning of stream is "a course of running water, a river, rivulet or brook." Century Dictionary. "A stream is a river, a brook or rivulet, anything in fact that is liquid and flows in a line or course." French v. Carhart, 1 N. Y. 107. "Stream implies a continuous current in one direction." Murdock v. Stickney, 8 Cush. (Mass.) 118. The appellee cited Fillmore v. Jennings, 78 Cal. 634, 21 Pac. 536, in which it was said: "The case falls exactly within the terms of section 1014 of the Civil Code, which is merely declaratory of the law as it has always existed." And it contends that thereby the court held section 1014 to be declaratory of the whole of the common law on the subject of accretion. But the decision was made with reference to accretion on the bank of a river. It is true, as said by the court, that the section is but declaratory of the law of accretion on the banks of rivers. The court did not say, nor is it implied in what was said, that the section is declaratory of the law of accretion on waters other than those particularly mentioned therein.

In addition to the statute so enacted in 1873, as bearing upon this question, is the constitutional provision found in the Constitution adopted in 1879, in which it is provided, in article 15, § 3, as follows:

"All tide lands within two miles of any incorporated city or town in this state, and fronting on the waters of any harbor, estuary, bay or inlet used for the purposes of navigation, shall be withheld from grant or sale to private persons, partnerships or corporations."

By the act of the Legislature of March 8, 1901, section 1014 of the Civil Code was amended by inserting therein after the word "stream" the words "or other water" (St. 1901, p. 395, c. 157); but, in Lewis v. Dunne, 134 Cal. 291, 66 Pac. 478, 55 L. R. A. 833, 86 Am. St. Rep. 257, the act was held to have been unconstitutionally adopted.

But it is said that the predecessors in interest of the appellee had a vested right to future alluvion, acquired before the adoption of the provision of the Civil Code above quoted and before the adoption of the present Constitution, a right to all alluvion that might be deposited upon its shore land in all time to come, and that this right is sustained by the dictum of the court in County of St. Clair v. Lovingston, 23 Wall. 46, 23 L. Ed. 59. In the course of the opinion in that case, it was said: "The riparian right to future alluvion is a vested right. Is is an inherent essential attribute of the original property." The controversy in that case did not even remotely relate to the

right to future alluvion, but related only to alluvion then existing. We cannot think that the court meant to announce the doctrine that the right to alluvion becomes a vested right before such alluvion actually exists. The language so used was quoted from the language, also obiter, of Bullard, J., in Municipality No. 2 v. Orleans Cotton Press, 18 La. 122, 36 Am. Dec. 624, in which it was said, in substance, that, if the Legislature had attempted to declare that thereafter owners of tracts of land fronting on a river should no longer be entitled to any alluvion which might be formed, such act would be held unconstitutional, on the ground that the right to future alluvion is vested.

In Pearsall v. Great Northern Ry. Co., 161 U. S. 646–673, 16 Sup. Ct. 705, 40 L. Ed. 838, the court quoted with approval from Cooley's Principles of Constitutional Law, 332, as follows:

"Rights are vested, in contradistinction to being expectant or contingent. They are vested when the right to enjoyment, present or prospective, has become the property of some particular person or persons as a present interest. They are expectant when they depend upon the continued existence of the present condition of things until the happening of some future event. They are contingent, when they are only to come into existence on an event or condition which may not happen or be performed until some other event may prevent their vesting."

Within that definition of vested rights, there can be no question, we think, that the right to future possible accretion could be divested by legislative action. To say that one who acquires from the state title to tide lands acquires therewith a vested right to all possible future accretion is to impose a restriction on the power of the state to occupy or improve for the public benefit the adjacent submerged lands. Said the Supreme Court of Washington, in Eisenbach v. Hatfield, 2 Wash. 236–250, 26 Pac. 539, 12 L. R. A. 632:

"But appellee claims that he has a vested right to future accretion to his land, and cites as authority to sustain his position the case of County of St. Clair v. Lovingston, 23 Wall. 46, 23 L. Ed. 59. And the court in that case does say that the riparian right of future accretions is a vested right. But we are unable to see how one can have a present vested right to that which does not exist, and which may never have an existence. It seems to us that the more reasonable doctrine is announced in the case of Taylor v. Underhill, 40 Cal. 471, in which case the court says: 'The plaintiff, as a riparian owner, has also a right to accretions to his land, and it is said the claim of defendant will be a cloud upon his title to such accretion. But, as yet, there is no such property, and there may never be. He cannot ask the court to interfere in advance, and prevent a cloud being cast upon his title to that which may never have an existence.'"

The Supreme Court of Iowa, by its decision in Chicago, Burlington & Quincy Ry. Co. v. Porter Bros. & Hackworth, 72 Iowa, 426, 34 N. W. 286, in effect denied that the right to future accretion is a vested right. In that case the railroad company, under a statute of the state authorizing it to occupy without payment of damages any of the state lands, had constructed its railroad along the Mississippi river below the ordinary high-water mark. The defendants were owners of the land bounded by the river. The court said:

"The lawful appropriation of the land by the Rock Island Railroad Company cut off accretions to defendant's land and established a line beyond which no right of accretion can be acquired."

In Sage v. Mayor, 154 N. Y. 61, 47 N. E. 1096, 38 L. R. A. 606, 61 Am. St. Rep. 592, it was held that, in every grant of lands bounded by navigable waters made by the government or by the state as trustee for the public, there is reserved by implication the right to improve the water front in aid of navigation for the public benefit without compensation to the riparian proprietor, and the decision in Shively v. Bowlby, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331, sustains the power of a state to cut off, without compensation, the right of a riparian proprietor to future accretion. We know of no decision in which this doctrine has been questioned. If it is within the power of the state to thus appropriate and improve tide land or submerged land in front of a riparian proprietor, and thus deprive him of the right to future accretion, what tenable ground is there for saying that the state may not by a statute accomplish the same result, and for holding that the state of California by its statute of 1872 could not lawfully make provision, as it did, that the limits of lands owned by riparian proprietors of bays and arms of the sea could not be extended over the lands then held by the state in trust for the public by virtue of any accretion that might thereafter be deposited thereon?

We are of the opinion, moreover, that the grant made by the state to the town of Oakland in 1852 was intended to have fixed and permanent boundaries. The question whether a boundary of granted lands is to be fixed or shifting is often one of intention, to be ascertained by reference to the nature and purpose of the grant and the attendant circumstances. Scratton v. Brown, 4 Barn. & Cress. 485. In Trustees of East Hampton v. Kirk, 84 N. Y. 215, 38 Am. Rep. 505, it was said:

"There may be a movable freehold, as when the crown grants to a subject the soil between high and low water mark. In that case the grant would be construed according to the presumed intention to convey the shore wherever from time to time it might be, and the same construction has been put upon a grant by a subject to whom the title to the shore was vested."

The policy of the Legislature of the state of California with reference to proprietory rights in the tide lands and flats on the bay of San Francisco had been indicated by its act of the year 1851, known as the "Beach and Water Lots Act," enacted for the purpose of establishing a water front for San Francisco, and adopting a line which defined the limit to which streets might be extended and lots and blocks laid out and sold. The title of the act in which the land was granted by the state to the town of Oakland is "An act to incorporate the town of Oakland and to provide for the construction of wharves thereat." In this expressed purpose, we may find evidence of the intention of the Legislature to fix a definite water front line. Said Chief Justice Beatty, in the Oakland Water Front Case:

"One of the most important ends contemplated in the creation of the corporation was the improvement of commercial facilities by the erection of convenient wharves along the water front. * * * What had been done in San Francisco was, indeed, an example and a guide to Oakland in disposing of her water front, and I do not doubt that it was the contemplation of the Legislature that substantially the same course should be pursued."

The state at the time of making the grant held the title to all the lands lying below the line of low tide.

The Supreme Court, in Gunter v. Geary, 1 Cal. 462, said: "Below low tide is a public highway common to all citizens." In Jones v. Soulard, 24 How. 41, 16 L. Ed. 604, the question arose as to the right of the city of St. Louis to accretion in the Mississippi river. The court, while sustaining that right, based it expressly upon its construction of the boundary line of the city, which it held was the middle thread of the Mississippi river, and held that up to that line the city was the owner of land created by accretion. In Indiana v. Kentucky, 136 U. S. 479, 10 Sup. Ct. 1051, 34 L. Ed. 329, it was held that the dominion and jurisdiction of a state bounded by a river continue as they existed at the time when it was admitted into the Union, unaffected by the action of the forces of nature upon the course of the river. The court said:

"If, when Kentucky became a state on the 1st of June, 1792, the waters of the Ohio river ran between that tract, known as 'Green River Island,' and the main body of the state of Indiana, her right to it follows from the fact that her jurisdiction extended at that time to low-water mark on the northwest side of the river. She succeeded to the ancient right and possession of Virginia, and they could not be affected by any subsequent change of the Ohio river, or by the fact that the channel in which that river once ran is now filled up from a variety of causes, natural and artificial, so that parties can pass on dry land from the tract in controversy to the state of Indiana. Its waters might so depart from its ancient channel as to leave on the opposite side of the river entire counties of Kentucky, and the principle upon which her jurisdiction would then be determined is precisely that which must control in this case. Missouri v. Kentucky, 11 Wall. 395, 401, 20 L. Ed. 116. Her dominion and jurisdiction continue as they existed at the time she was admitted into the Union, unaffected by the action of the forces of nature upon the course of the river."

In Shively v. Bowlby, a case in which a donation land claimant had, while Oregon was still a territory, obtained title to land fronting on the Columbia river the court expressly recognized that it was within the power of Congress, if it had chosen to do so, to grant to such settler land below high-water mark, but found reason for holding that it was not the intention of Congress to grant such right, in the general policy of the government to hold tide lands in trust for the future state.

Applicable to this question are the remarks of Mr. Justice Field, in Weber v. Harbor Commissioners:

"Upon the admission of California into the Union upon equal footing with the original states, absolute property in and dominion and sovereignty over all soils under the tide waters within her limits passed to the state with the consequent right to dispose of the title to any part of said soils in such manner as she might deem proper, subject only to the paramount right of navigation over the waters. * * * The erection of his wharf, the obstruction to the use of which is the cause of the present suit, was therefore not only an interference with the rightful control of the city over the space occupied by it, but was an encroachment upon the soil of the state, which she could remove at pleasure."

It would be subversive of the policy of the state, and the purpose for which its title in lands below low tide is vested, to hold that the corporate lines of the town of Oakland, a political subdivision of the state, and the grant of lands expressly declared to be within those limits, are not permanent, but shifting, boundaries incapable of definite ascertainment at any time. "Because," says Dillon, "the local juris-

·diction of the incorporated place is in most cases confined to the limits of the incorporation, it is necessary that these limits be definitely fixed." 1 Dillon on Municipal Corporations, 182.

· Upon the issues and the evidence, and the law applicable thereto, it is our judgment that the court below was in error in ordering the injunction pendente lite in favor of the appellee.

The decree is reversed, and the cause is remanded for further proceedings not inconsistent with the foregoing opinion.