Davis, J.,
delivered the opinion of the court:
It is contended upon plaintiff’s behalf that, through the construction of the aqueduct in the District of Columbia, he was directly injured in certain property rights, not included in the appraised value of the land taken from him under condemnation proceedings. The property in question borders upon Hock Creek near the Oak Hill Cemetery; most of it is on the east bank of the creek; at the upper end is a mill-dam, at the lower end is the mill; a short distance below the dam and above the mill is the land taken by the Government for a shaft, while opposite the land so taken by defendants and upon the western bank of the stream is a narrow strip of land which still belongs to plaintiff. The income from this property was derived first from the mill, and as to that there is no question here, and second from sand which was deposited upon the land still owned *41 by plaintiff. This deposit the Government works at the shaft (above his present possession) have reduced through a narrowing of the stream and a consequent increase in the speed of the current which now holds the sand in suspension as the water passes his land. Another point made is that the Government land was so carved out of plaintiff’s property as to isolate the narrow strip upon the western bank. Other inj uries are alleged, which we shall consider in their order.
• The property condemned was appraised in accordance with the Act of July 15,1882 (22 Stat. L., p. 168), by a board whose duty it was “to fairly and justly value the same;” the amount fixed by this board was accepted by the plaintiff, a deed was executed by him, and he was paid.
The duty of appraisers in condemnation proceedings generally is to consider all elements of danger, past and present, as well as any future damages which the improvement may reasonably produce; and any damage (not resulting from negligent or unskillful construction) is presumed to be included in the assessment. (Mills on Eminent Domain, 216.)
We have now to inquire whether the statute under which ■the appraisement in this case was made contains any provision ' changing the general rule.
One of the sections of the act provides that:
“ The appraisers shall only consider the present value of the land without reference to - its value for the uses for which it is taken under the provisions of this act.”
This provision has no effect upon plaintiff’s rights, it is merely a direction to the appraisers to allow the actual value of the land as distinguished from its value for tunnel purposes ; that is, to allow what it was worth in the market, not its value to defendants for the special and unusual use for which it was destined. The value of land for engineering purposes might well be much more or much less than its value in the market for ordinary purposes; any such artificial value Congress by , this provision of the statute eliminates from the question submitted to the appraisers.
The appraisers are directed to “ fairly and justly value ” the •tract of land; the Attorney-General is thereafter to pay “ the amount fixed by the appraisers as the value thereof.” Nothing here is intimated about a consideration of damage, past, present, or future; on the contrary, the plain meaning is, that *42 the value to be appraised is not that of rights which plaintiff may lose by the condemnation, not of the injury to other property owned by him adjacent to that taken, but the fair and just value of the land actually appropriated, and that alone. There might be some hesitation in reaching this conclusion because of the injustice to the individual owner, were it not for the protecting feature of a succeeding provision, designed evidently to cover loss by incidental damage not included in the bare value of the land condemned. The statute further provides, in substance, that when a person having any estate or interest in any of the lands condemned shall for any reason not have been tendered payment of the sum fixed by the appraisers, or shall have declined to accept the amount tendered therefor, or when any person who, by reason of the taking .of said land, or by the construction of the aqueduct works, “ shall be directly injured in any property right,” that person may sue in this court for damages.
The plaintiff herein has accepted the amount offered for the land actually taken, so no question in regard to that land is before us. What he asks now is compensation for injury to other property adjacent to that condemned, caused by two things; first, the taking of the land; second, the construction of the works. The taking of the land cut him off from access to other land owned by him ; the construction of the works has destroyed a certain benefit he has hitherto enjoyed in land still held by him below the tract now occupied and owned by defendants.
Whether damages of this nature would or would not, under ordinary circumstances, be included in an appraisement in condemnation we need not now inquire, for the statute in question seems to demand of the appraisers simply a fair valuation of the land actually taken, and refers to this court every question of damage. Congress evidently intended to submit to the appraisers one question only, the fair and just value of the land, and to send to this court all questions of damage. The plaintiff, being satisfied with the award for the land, has accepted it, receipted for the money, and executed the deed. His damage, however, has never been considered in any forum, and no other forum than this court has any power to grant him a remedy should his complaint be well founded. The case is therefore properly before us, and we shall inquire whether the *43 plaintiff has been “ directly injured ” íd any property right by the taking of the land or by the construction of the tunnel.
.The force and effect of the word “ directly ” we have already considered in the case of Alexander and Little v. The United States (25 C. Cls. R., 87, 329), where we held that in using this word “ Congress intended to limit the responsibility of the defendants against such damages as might be remotely connected with the work contemplated by the act and not against consequential injury, which might directly result from the prosecution of the work; ” further, “ Congress [in using the term {directly injured’] intended to legislate against the claims for damages not directly traceable to the construction of the work authorized by the terms of the law; ” in fact, the word “directly” not having a technical significance in the law, must be understood in its colloquial sense; that is, the injury complained of must have been proximate and actual.
When defendants appropriated the tract of land now in their possession, they so carved it out of the greater tract owned by plaintiff as to separate a small strip on the western bank of Eock Creek from the land retained by plaintiff upon the east bank; that is, the land taken by defendants is opposite a strip owned by plaintiff; thus, it is alleged, does plaintiff suffer a double injury; first, in that he is deprived of'any right of way to the western strip; second, in that he had lost the right to place a dam across the creek, as the proposed point of eastern abutment is now held by defendants. Upon this second claim the findings of fact are adverse to plaintiff and we need not further consider it. The isolation of the western strip is a damage to plaintiff, and is a damage which flows directly from the taking of the property; the land is inaccessible and its value is lessened in the sum of $950. (Galena and Southern Wisconsin R. R. v. Birkbeck, 70 Ill., 208; Peoria, Atlanta and Decatur R. R. Co. v. Saicyer, 71 Ill., 361.)
Having taken and paid for the land, defendants sunk thereon a shaft; the rock taken from this shaft was deposited by the contractors upon the shore of Eock Creek in such manner as to narrow the stream. It is not contended that the stream was diverted, but only that it was narrowed; that by this narrowing the velocity of the current was increased, and so certain deposits of sand ceased which had been made theretofore at irregular periods upon plaintiff’s land. It seems that during *44 freshets Eock Creek overflowed plaintiff’s land, and moving slowly over the submerged portion, deposited there sand, which, when the waters receded, was sold for building purposes. The amount of this deposit depended upon the accidents of nature, and, of course, would be diminished if the current were swift. Damages have been allowed for overflowing land through the construction of engineering works (Pumpetty v. Green Bay Co., 13 Wall., 166), but ordinarily the confining of a stream within its bed or any other work which tends to prevent the natural results of freshet has been considered a benefit, not an injury.
The property in question is upon the immediate outskirts of a large and growing- city. Through it runs a stream of irregular volume, which has traversed a settled country, and is at all times subject to such incidents of use as the developing population may require. It is easy to understand that its old uses will largely cease, and that, perhaps, .before many years parts of it may be covered in and disappear from the light, as have other streams in this District, notably the Tiber, or Goose Creek. For a right whose value can be fixed, such as a mill right or a wharf right, which may be destroyed in the prosecution of a public improvement, compensation would undoubtedly be given; but would it be given to one deprived by a public improvement of an uncertain benefit derived from the occasional and irregular accidents of nature, particularly when those accidents are harmful in their character ? This plaintiff asks damages because the Government has limited the effects of a freshet, and this on the ground that, while freshets are generally injurious and their prevention a benefit, in his case the reverse is true, as they cover his land with sand washed away from some one else’s property higher up on the stream, and from the sale of this sand he derives a profit. It is possible to suppose the contention applied to a riparian owner who, by fences or walls, or by the planting of trees and shrubbery, prevented the washing of sand into the creek to be afterwards, perhaps, deposited upon plaintiff’s land.
The projected Eock Creek Park and Zoological Gardens are to be laid out at no great distance above plaintiff’s property $ it is not improbable that in the course of the preparation of these improvements for public use the stream may be walled in or otherwise confined more strictly to its bed, and that the *45 banks will be so protected as, if possible, to prevent washing. Would a riparian owner below find in such work a valid ground for claiming damages because deposits of sand were no longer made upon his land íd time of freshet. So the deepening of the stream below plaintiff by a neighbor desirous of protecting his own land would tend to quicken the current above and carry the sand by plaintiff while held in suspension. There are many elements of uncertainty in a claim of this description; its value depends upon the accidents of nature, upon the legitimate and proper use of the stream both above and below plaintiff, and the natural use’of their land by riparian owners above him, and we are of opinion that the use by the Government of the stream does not injure plaintiff in any tangible property right.
Nor are there disclosed any methods by which with reasonable certainty we could estimate the amount of plaintiff’s loss. How many freshets will occur under.the changed conditions caused by increasing population is a matter of speculation, though the averages of past years might give some standard for calculation. The development of the country above plaintiff presents a more difficult element of estimate, as it tends to restrain the washing of the banks and make it unlikely that sand will hereafter be brought down the stream in so great quantities as. heretofore. It is not shown that -even now the stream carries as much sand as during the period prior to the condemnation of the land. If, then, plaintiff had a property right in the chance or probability that deposits would continue in the future in the same average amounts as in the past, there is no sufficiently definite measure shown upon which we can compute any damage he may sustain in this regard. (People of the State of New YorK v. The Mayor, etc., of Albany, 5 Lansing, 524; Seely v. Alden, 61 Penn. St., 302.) '
The right to any sand deposit upon the land actually condemned and now occupied by the Government, if of ascertainable value, was included by the appraisers as an item of the just and fair value of that land which they fixed, and can not here be claimed as an “injury” resulting from the condemnation. Nothing is allowed upon this item of claim.
In the deed and in the. price paid for the laud taken was included a right of way over the property still held by plaintiff from the foot of Mill street, Georgetown, to the land con- *46 clemned and now owned by defendants, and it is alleged that this right of way is so laid off as to split plaintiff’s land, leaving one strip almost or quite inaccessible, “ to plaintiff’s injury.”
Under our construction of the statute, plaintiff, who has been paid for the land taken, may come here for damages arising from the taking of the land or from the construction of the works, but we do not find that he has suffered damage from the condemnation of this right of way.
Judgment for $950.