COHEN v. UNITED STATES.

(Circuit Court, N. D. California. July 18, 1908.)

No. 13,544.

1. EMINENT DOMAIN—"TAKING OF PROPERTY" AS GROUND FOR COMPENSATION—DIVERSION OF WATERS OF STREAM.

The diversion of the water of a nonnavigable stream by the United States, so as to deprive a landowner of its natural flow adjacent to and upon his premises, for the purpose of improving the navigation of other navigable waters, is a "taking of property" of such landowner, within the meaning of the fifth amendment to the Constitution, which entitles him to just compensation therefor.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 8, pp. 6852–6860; 7813.]

2. SAME—EVIDENCE OF DAMAGE.

Evidence considered, and held not to sustain the claim of a landowner that her land received benefit from the water of a stream, which flowed only during the rainy season and overflowed her land in times of freshets, so as to entitle her to compensation from the United States for a diversion of such stream in improving the navigation of other waters.

3. WATERS AND WATER COURSES—RIPARIAN OWNERS—RIGHTS IN FUTURE AC-
CRETIONS.

A riparian owner has no vested right in future accretions, and cannot maintain an action for damages against one who lawfully obstructs or diverts a stream which has in the past carried and deposited such accretions from the lands of others, so that it will no longer do so.

Action to Recover Compensation for Diversion of Water Course.

J. J. Scrivner and Alfred H. Cohen, for petitioner.

Robert T. Devlin, U. S. Atty., and George Clark, Asst. U. S. Atty., for the United States.

MORROW, Circuit Judge. This action was commenced January 29, 1904, under Act March 3, 1887, c. 359, 24 Stat. 505 (U. S. Comp. St. 1901, p. 752). This act gives the Circuit Court of the United States concurrent jurisdiction with the Court of Claims of suits against the United States where the amount of the claim exceeds $1,000 and does not exceed $10,000. The action is based upon the claim of an implied contract for compensation for the value of a stream of water diverted from petitioner's premises by the United States in the improvement of Oakland Harbor.

The act of Congress approved March 3, 1873 (17 Stat. 566, c. 234), contained a provision for the survey and examination of San Antonio creek or estuary by the engineers of the army, under the direction of the Secretary of War, with a view to the improvement of Oakland Harbor. Under this authority the Board of Engineers made an examination and survey and reported a plan of improvement, which included the excavation of a tidal canal in Alameda county from the upper end of the estuary of San Antonio to San Leandro Bay, a distance of about 8,400 feet. The object of the canal was to carry a tidal current from San Leandro Bay into the estuary of San Antonio, and thus increase the tidal prism of the Oakland Harbor. The plan was approved by the proper authority, and the United States proceeded to condemn and acquire the land on the line of the proposed tidal canal. The improvement included also a subsidiary canal along a part of the northern or upper side of the main canal. The purpose of the subsidiary canal was to divert flood water that would otherwise empty into the canal from Sausal creek, a small unnavigable stream coming down from the hills to the north of, and from a direction at a right angle to, the canal, but which at the line of the canal turns to the east and empties into Brickyard slough, an arm of San Leandro Bay, navigable waters in which the tide ebbs and flows. The creek has about four or five square miles of watershed, and is a winter stream, carrying the rainfall in the immediate vicinity of its origin and course for a period of seven months in the year. During the remaining five months the bed of the creek is dry.

The work on the main canal was commenced by the United States in January, 1891, and was completed in March, 1903. The subsidiary canal was commenced in March, 1900, and finished in October, 1900. The main canal is a channel of 400 feet in width at the top and 300 feet at the bottom. It is 8 feet deep at low water and 14 feet deep at high water. The petitioner in this case is the owner of a tract of

land in Alameda county, containing 110 acres, lying to the south of the canal. The northern boundary of this tract extended along the line of the main canal a distance of about 1,970 feet. Along this boundary the line of the canal followed the course of Sausal creek and Brickyard slough. On February 9, 1903, the United States purchased from the petitioner two small tracts of land on the irregular line of the creek and slough for the purpose of giving the canal a uniform course. One of these tracts contained 2.16 acres and had a length along the line of the canal of 771.12 feet, and the other contained .54 acres and had a length along the line of the canal of 635.17 feet. Between these two pieces of land the boundary of petitioner's land had a line along the slough of 249.35 feet, which, being a satisfactory line for the canal, was not purchased. The total of these parts of the boundary line amounted to 1,655.64 feet, leaving approximately 315 feet of the boundary line of petitioner's land, in the northwest corner, along the line of Sausal creek. At this point the bend of Sausal creek is below the line of the canal. Petitioner claims that prior to the construction of these main and subsidiary canals the waters of Sausal creek were of great benefit and value to her lands; that they yearly brought down to and deposited upon her lands, adjacent to and through which said Sausal creek ran, gravel, silt, and alluvial earth; that the gravel was a merchantable article, and the silt was of great benefit to petitioner's lands, as it enriched the same and made them more fertile, and the overflow of the water was of great benefit to the land by reason of the natural irrigation which caused the same to produce green feed during the summer months for petitioner's horses, cattle, and other domestic animals.

The petitioner claims that by the diversion of Sausal creek she has been deprived of the use and benefit of 1,500 tons of gravel for each of the three years preceding the commencement of this action, making a total of 4,500 tons of gravel, of the value of $6,750; that but for the diversion mentioned the creek would have continued to deposit at least the same amount of gravel upon petitioner's land for all time, and that such deposit would, in the ordinary course of nature, have increased each and every year, and petitioner would have derived an annual benefit and revenue therefrom of $2,250; that but for the diversion mentioned the creek would have brought down and deposited upon the lands of petitioner, adjacent to and through which said creek ran, large quantities of silt and alluvial earth, which would have been of great benefit to the lands of petitioner, as it would have enriched the same and made them more fertile, and the overflow of said water would have been of great benefit to said lands, for the reason that it was a natural irrigation, which caused the same to produce green feed during the summer months for petitioner's horses, cattle, and other domestic animals; that the value of said deposits upon said lands is at least $5,000; that the value of the water of said Sausal creek so taken and appropriated by the United States is the sum of $5,000. Petitioner claims that the detriment to her property caused by the diversion of Sausal creek, as alleged, amounts to the sum of $24,000; but petitioner waives the excess over $10,000, and claims

compensation in the latter sum. The answer of the United States denies all the material allegations of the petition.

In Gibson v. United States, 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996, the Supreme Court held that riparian ownership on navigable waters was subject to the obligation to suffer the consequences of an improvement of the navigation under an act of Congress passed in the exercise of the dominant right of the government in that regard, and damages resulting from the prosecution of such improvement could not be recovered in the Court of Claims. In that case the object of the petition was to recover damages because of the construction of a dike by the United States in the Ohio river at a point off Neville Island, about nine miles west of the city of Pittsburg. The dike was constructed for the purpose of concentrating the flow of the Ohio river. The petitioner was the owner and in possession of a tract of land on this island in a high state of cultivation, from which she shipped strawberries, raspberries, potatoes, melons, apples, and peaches to the cities of Pittsburg and Allegheny, Pa. The petitioner's farm had a frontage of 1,000 feet on the main navigable channel of the Ohio river, where she had a landing which was used in shipping the products from and the supplies to her farm. This landing was the only one on petitioner's farm from which she could ship the products from and supplies to her farm. The construction of the dike by the United States had the effect of substantially destroying the landing of the claimant, by preventing the free egress and ingress to and from said landing on and in front of claimant's farm to the main navigable channel of the river. The Supreme Court held that there was no physical invasion of petitioner's property, and, referring to the fifth amendment to the Constitution of the United States, providing that private property shall not "be taken for public use without just compensation," said:

"The damage of which Mrs. Gibson complained was not the result of the taking of any part of her property, whether upland or submerged, or a direct invasion thereof, but the incidental consequences of the lawful and proper exercise of the governmental power."

The judgment of the Court of Claims that the petitioner was not entitled to recover, and dismissing the petition, was affirmed.

In Scranton v. Wheeler, 179 U. S. 141, 21 Sup. Ct. 48, 45 L. Ed. 126, the Supreme Court held that the prohibition in the Constitution of the United States against the taking of private property without just compensation had no application to the case of an owner of land bordering upon a public navigable river, whose access from his land to navigability is permanently lost by reason of the construction, under authority of Congress, of a pier resting on submerged lands away from, but in front of, his upland, and which pier was erected by the United States, not with any intent to impair the right of riparian owners, but for the purpose only of improving the navigability of such river.

In Mills v. United States (D. C.) 46 Fed. 738, the government, for the purpose of improving the navigability of the Savannah river, erected a dam, which raised the level of the river, and this prevented the owner of adjoining rice fields from draining his canals into the river between high and low water marks, as he had previously done, but did not ac-

tually invade his premises. It was held that the injury to the rice fields did not constitute the taking of private property within the meaning of the constitutional prohibition against the taking of private property for public use without just compensation.

In United States v. Lynah, 188 U. S. 445, 23 Sup. Ct. 349, 47 L. Ed. 539, the petitioner brought suit in the Circuit Court for the District of South Carolina to recover of the United States the sum of $10,000 as compensation for certain real estate which it was alleged had been taken and appropriated by the United States. The taking and appropriation consisted in building and maintaining in and across the Savannah river certain dams, training walls, and other obstructions obstructing the natural flow of said river in and along the natural bed, and so raising the level of said water above said obstructions, and causing its water to be kept back and to flow back and be elevated above its natural height in the natural bed. By the raising of the level of the river by these obstructions the water thereof had been backed up against the embankment on the river, and had been caused to flow back upon and in petitioner's plantation above the obstruction, and had actually invaded said plantation, directly raising the water thereon about 18 inches, which it was impossible to remove therefrom, and by reason of which the plantation had been practically destroyed and rendered of no value. The Supreme Court held that the improvement of the Savannah river in this case amounted to the taking of petitioner's property within the scope of the fifth amendment, and that the government was under an implied contract to make just compensation therefor.

The present case is distinguished from the foregoing cases in the fact that Sausal creek is not a navigable stream and the construction of the canal by the government was not for the benefit or improvement of that stream, but for the improvement of navigable waters in another and different locality, and it is claimed by the petitioner that the injury she suffered was the taking of her private property (the waters of Sausal creek) for a public use, and that for the taking she is entitled to just compensation. This distinction between acts of the government damaging private property on a navigable stream in the work of improving its navigability and the taking of private property connected with an unnavigable stream for public use in improving navigable waters elsewhere was recognized when the court disposed of the demurrer to the complaint, and is now referred to in considering the case on its merits, for the purpose of making clear the precise character and scope of petitioner's cause of action.

The government has diverted the waters of Sausal creek at the point where it enters the subsidiary canal, and in effect has taken and appropriated the stream below that point, and the petitioner has been deprived of its flow adjacent to and upon her premises. This is a taking, within the constitutional provision. But the question remains to be determined, what was the value of the waters of this creek at the time of their diversion, for which the petitioner is entitled to just compensation?

The petitioner's cause of action is based upon the claim of riparian ownership and appropriation of the waters of Sausal creek. This

claim is, however, subject to an appropriation made by the Contra Costa Water Company in 1874 or 1875, when it placed a dam in the creek at a point about 2½ miles from the line of the present canal. This dam the water company has maintained ever since. The pipe used by the water company for diverting the water of the creek is a seven-inch pipe. How much water is impounded and diverted by this pipe is not disclosed by the evidence, but it must necessarily carry the first flow of the winter rain and the last flow of water in the spring. The water that reached and overflowed petitioner's lands after 1874 or 1875, and prior to the diversion of the creek in the year 1900, was, therefore, not the flood waters of the entire creek, but the somewhat lesser volume after the flow of the creek had been diminished by the water company's appropriation. The evidence as to the value of this flood water to the land of the petitioner at the time of its diversion is conflicting. There was evidence on the part of the petitioner that it was of value for the silt it brought down and deposited on petitioner's land and for the wetting of the land, which caused late feed for cattle. William G Cohen, a son of the petitioner and one of her principal witnesses, testified that Sausal creek entered petitioner's land at a point indicated on a map introduced in evidence; that from this point the creek formerly ran through petitioner's premises until it reached Brickyard slough, but to obviate the tearing and ripping of the water at flood times they dug a ditch, a continuation of Sausal creek, from the petitioner's property, through property belonging to another party, and then back to petitioner's property lower down. He says this must have been in the 70's. The last grain crop was in the 70's. Prior to that time the witness says they had two dams in the creek to divert the water over petitioner's land, but after that time they did not have the dams, and as a result they did not have the benefit of the late irrigation, and the only overflow of the creek since that time has been when they have had freshets.

Testimony on behalf of the United States was that this overflow water was of no benefit to petitioner's land. The weight of evidence was that this flood water came at the wrong season of the year. It came in the winter, when it had no value for irrigation, and did not come in the summer, when it would have been of value. When the water did come, the land needed drainage, and not irrigation; furthermore, that petitioner's land has suffered no depreciation in value by reason of the diversion of the creek. From this evidence I am unable to find that the water of Sausal creek had any value to the petitioner at the time of the diversion, either for irrigation or for domestic purposes, or for the enrichment of the soil by deposit of silt. With respect to that phase of petitioner's cause of action there must, therefore, be a finding in favor of the defendant.

The next element in petitioner's cause of action is the habit of the water of Sausal creek to carry and deposit gravel during the rainy season in the bed of the creek adjacent to petitioner's premises. This gravel appears to have been washed from the banks of the creek; but, as the land along the creek has become occupied by residences, the banks have been bulkheaded at a number of places, and the evidence shows that at the time of the construction of the canal this wash of

gravel down the creek had very materially diminished. But the first question to be determined is whether the petitioner is entitled to recover compensation for the loss of this gravel, whether the quantity be more or less.

The riparian owner has no vested right in future accretions. Western Pac. Ry. Co. v. Southern Pac. Co., 151 Fed. 376, 399, 80 C. C. A. 606. The riparian owner cannot have a present vested right to that which does not exist, and which may never have an existence. Taylor. v. Underhill, 40 Cal. 471; Eisenbach v. Hatfield, 2 Wash. 236, 250, 26 Pac. 539, 12 L. R. A. 632. In Chicago, B. & Q. Co. v. Porter, 72 Iowa, 426, 34 N. W. 286, two railroad companies, the Chicago, Rock Island & Pacific and the Chicago, Burlington & Quincy, had constructed their tracks along the Des Moines river, below the ordinary high-water mark, under the authority of a law of the state. The lines were practically parallel with each other and about 80 feet apart. The defendants were the owners of the land which was bounded by the river at the point opposite the lines of the two railroads, and they proposed to erect and. maintain a brick building. upon lands made by accretions between the two railroads. The defendants were enjoined from building upon this land. The Supreme Court of the state held that:

"The lawful appropriation of the land by the Rock Island Railroad Company cut off accretions to defendants' land and established a line beyond which no right by accretions can be acquired."

In Lyons v. United States, 26 Ct. Cl. 31, 44, the plaintiff was the owner of a tract of land bordering on Rock creek, in the District of Columbia, an unnavigable stream. It seems that during freshets Rock creek overflowed plaintiff's land, and, moving slowly over the submerged portion, deposited there sand, which, when the waters receded, was sold for building purposes. The amount of this deposit depended upon the accidents of nature, and, of course, would be diminished if the current were swift. The contractors under the government, in sinking a shaft for an aqueduct above plaintiff's land, had deposited rock upon the shore of Rock creek in such a manner as to narrow the channel of the stream and increase the speed of the current, so that it carried the sand held in suspension beyond plaintiff's land, and deposits of sand were no longer made upon his land in times of freshets. The court, in stating the case, said:

"This plaintiff asks damages because the government has limited the effects of a freshet; and this on the ground that, while freshets are generally injurious and their prevention a benefit, in his case the reverse is true, as they cover his land with sand washed away from some one else's property higher up on the stream, and from the sale of this sand he derives a profit. * * * The projected Rock Creek Park and Zoological Gardens are to be laid out at no great distance above plaintiff's property. It is not improbable that in the course of the preparation of these improvements for public use the stream may be walled in or otherwise confined more strictly to its bed, and that the banks will be so protected as, if possible, to prevent washing. Would a riparian owner below find in such work a valid ground for claiming damages because deposits of sand were no longer made upon his land in time of freshet? So the deepening of the stream below plaintiff by a neighbor desirous of protecting his own land would tend to quicken the current above and carry the sand by plaintiff while held in suspension. There are many elements of uncertainty in a claim of this description. Its value depends upon the accidents

of nature, upon the legitimate and proper use of the stream both above and below plaintiff, and the natural use of their land by riparian owners above him, and we are of opinion that the use by the government of the stream does not injure plaintiff in any tangible property right."

It follows from these authorities that the riparian owner, having no vested right in future accretions, cannot maintain an action for damages against one who lawfully obstructs or diverts the stream carrying such accretions, so that such deposits are no longer formed adjacent to her premises.

It is contended, however, on behalf of petitioner, that she is not seeking compensation for the loss of gravel brought down by Sausal creek, but for the value of the stream for which use this is an element, ·  that the habit of the stream to bring gravel to her premises was evidence of such value. But this habit, as we have seen, was not fixed or stable. It depended upon conditions that were so uncertain that no value can be attached to the habit.

In my opinion Sausal creek had no value in this respect at the time of the diversion, either present or prospective, for which petitioner is entitled to recover compensation. Let the findings be prepared in accordance with this opinion, and a judgment entered accordingly.